IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Lakisha Vaughan <br> P O Box 48116 <br> Washington, DC 20002 <br><br>         Plaintiff, <br><br> v. <br><br> CAPITAL CITY PROTECTIVE SERVICES II, LLC <br> 4841 Walden Lane <br> Lanham, MD 20706 <br><br>         Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No.: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **COMPLAINT**

(Employment Discrimination and Retaliation)

1. Lakisha Vaughan was subjected to sexual assaults and harassment by managers employed by Defendant Capital City Protective Services II, LLC ("Capital City"). After she reported the harassment to the company, defendant retaliated against her and constructively discharged her from her employment. Defendant's actions amounted to discrimination based on sex and retaliation, and thus violated Title VII of the Civil Rights Act of 1964, the District of Columbia Human Rights Act (DCHRA) and the Prince George's County Code, as authorized by Maryland Code §20-1202.

## **JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-5, et seq., and 28 U.S.C. § 1331, and exercises pendent jurisdiction over the state/local law claims. Venue is appropriate in this Court as

Plaintiff worked for defendant in the District of Columbia and some of the discriminatory and/or retaliatory actions at issue in the case took place in this District.

## PARTIES

3.   Lakisha Vaughan was employed by defendant Capital City to work in the District of Columbia.

4.   Defendant Capital City is a company organized under the laws of the State of Maryland, with headquarters in Prince George's County Maryland. Defendant operates a for-profit business providing security services in the District of Columbia. Defendant is an employer, as defined by Title VII, the DCHRA and the P.G. County Code.

## FACTS

5.   In late April 2018, Defendant hired Plaintiff to work as a D.C. Special Police Officer working in the Company's Shelter unit, located in the District of Columbia. In that position, she reported to Lieutenant Herbert Griffin III, who reported to Captain Eric Henry. Captain Henry reported to Inspector Andre Jackson. In her role as a D.C. Special Police Officer, and in all other positions she was assigned up to the date of her constructive discharge, Plaintiff was a dedicated and competent officer who provided exemplary service to Capital City and the clients she served.

6.   In June 2018, Plaintiff sought a transfer to the Housing unit, a position which would have resulted in an immediate increase in her hourly pay rate and greater potential for future promotions and pay raises. At that time, she called Captain Ray Gordon, who was the commander of the Housing unit, to notify him of her request for a transfer. Prior to that call, Plaintiff had very limited contact with Captain Gordon, and certainly had not developed any type of social relationship with him. When she spoke with Captain Gordon, she also notified him that

she would be seeking a shift change from her previous assignment (working the evening shift) to a 7:00 a.m. to 3:00 p.m. shift, which would allow her to be home when her child returned from school.  During the conversation, Gordon appeared to be supportive of her requests.

7. On June 26, 2018, Captain Gordon called Plaintiff and informed her that the company was granting her transfer request.  He told Plaintiff to come to the company's headquarters in Prince George's County when she finished her shift to sign the transfer and pay raise paperwork.  Plaintiff complied with that instruction.  When she first appeared, coming straight from her shift, Gordon told her that the paperwork was not yet ready, and advised her to return later that evening.  Accordingly, Plaintiff went home to change and then returned to the headquarters to meet with him about these job benefits.

8. When Plaintiff returned to headquarters, she found several officers gathered, including Captain Gordon, his supervisor, Inspector Jackson, Sergeant Jamarr Lynch, Lieutenant James Parker, Jr., and Sergeant Kisha Williams. All of the officers except for Sergeant Williams were drinking alcohol.  Inspector Jackson and Captain Gordon, the two highest- ranking officers in the room, invited Plaintiff to have a drink to celebrate her transfer to the Housing unit.  Plaintiff felt a bit awkward with the suggestion, but accepted (although she only drank a small amount).

9. After nearly thirty minutes, Captain Gordon instructed Plaintiff to come into his office to fill out the transfer paperwork.

10. When she entered his office, Captain Gordon closed the door, turned off the lights, undid his belt, walked up behind her, and started taking off her pants.  Plaintiff had done nothing to suggest to Captain Gordon that she was interested in a sexual relationship with him, and she certainly had not consented to his conduct in any way, and it was not welcome.

11. Plaintiff was shocked by his actions, and when Gordon began sexually assaulting her she froze. Captain Gordon imposed sexual intercourse on her, while she remained silent, terrified and in a state of shock. During the incident, Gordon told Plaintiff that he would make sure she got the 7 a.m. to 3 p.m. shift she had requested, and a promotion to Sergeant.

12. When he finished, Plaintiff left the building and hurried to her car. Captain Gordon followed her and told Plaintiff that he wanted to see her socially. She did not respond, and drove away as quickly as she could.

13. Plaintiff had no romantic interest in Captain Gordon, and she had done nothing to suggest to him that his interest in a sexual relationship was welcome. She was happily married at the time. Captain Gordon did not genuinely believe that Plaintiff would be interested in any sexual relationship with him. Instead, he used his size, status as her supervisor, and his ability to either grant or deny her legitimate requests for promotion, pay raise and shift change as the means to coerce her into submitting to his sexual assault.

14. When Plaintiff got home that evening, she called a friend and work colleague, Dispatcher Tanesha Sollers, to tell her that Captain Gordon forced sexual intercourse upon her.

15. A short time later (roughly a week or two), Captain Gordon called Plaintiff and instructed her to meet him at an auto-body shop he owned in Prince George's County. Plaintiff hoped that he was going to provide her more information about the pay raise and shift change, which she had not yet received.

16. When she arrived at his auto-body shop, Captain Gordon was sitting in a Company vehicle. He rolled down a window and told her to get inside. When she entered the vehicle's passenger seat, he immediately began touching her and told her to get into the back seat. Plaintiff felt she had no choice but to submit to his unwelcome advances, and

complied. She feared that if she resisted, he would take action that could cause her to lose her job, which she depended on for her family's financial security. In the back seat, Gordon removed her pants and again subjected her to sexual intercourse. When he finished, she got out of the car and fled as quickly as possible. As with the first assault, Plaintiff had not said or done anything to suggest to Captain Gordon that she was interested in a sexual relationship with him, and his conduct was entirely unwelcome.

17. After this second incident, it soon became apparent that Captain Gordon had bragged to his male colleagues about having sexual intercourse with Plaintiff. Over the next couple of months, she experienced persistent sexual harassment from Captain Gordon, Inspector Jackson, Lieutenant Griffin, and Captain Henry. This harassment consisted of them visiting her work site in the District of Columbia and leering at her in a sexual manner, and sending her texts, suggesting that she meet them at their homes. One of the senior officers, Captain Henry, also sent her an unsolicited and unwelcome picture of his penis. Inspector Jackson and Lieutenant Griffin (both senior officers within the command), made comments mocking her for having "given some" to Captain Gordon, and suggested that she had relented to the wrong officer and should submit to sexual intercourse with them. Inspector Jackson on one occasion grabbed Plaintiff's rear end while remarking that Captain Gordon "can't handle all of this." At a cook out that Plaintiff was told would be a company event, Plaintiff was talking to Major Brown when Captain Gordon came up behind her and started "grinding" on her rear end. Major Brown witnessed this but took no action. Plaintiff told Captain Gordon to stop, and then she left the cookout.

18. As with Captain Gordon, Plaintiff had done nothing to suggest that she was romantically or sexually interested in any of these men (who all exercised supervisory authority

over her), and their actions were entirely unwelcome.

19. Plaintiff was disgusted by these actions and sexually explicit messages she had received, and she deleted them from her phone. Prior to doing so, she showed the text messages and the picture to Ms. Sollers, and told her about the abuse from senior leadership. Ms. Sollers advised that she had heard stories of other women being subjected to this same type of abuse, and that the company took no action to protect them. Plaintiff felt extremely vulnerable and was scared of retaliation, since many (if not most) of the male leadership of the company had participated in this abuse.

20. All of this demeaning and unwelcome sexual conduct caused Plaintiff significant embarrassment, humiliation, fear and emotional distress. It adversely altered her daily work environment, as she constantly feared that male supervisors would subject her to this type of sexually explicit, unwelcome, and physically threatening and demeaning behavior.

21. Initially, Plaintiff was too afraid to report this sexual exploitation by a group of superior officers who had control over the terms and conditions of her employment. In mid-September 2018, however, she gathered her courage, went to headquarters, and reported the sexual harassment to multiple members of Company management, including Executive Vice President and Director of Human Resources Armenta V. Bell (who is also the spouse of the owner of the company), Major Tiffany Chapman, and Detective Gary O'Neal.

22. Plaintiff submitted a written complaint at that time describing the abuse. Upon information and belief, Defendant also tape recorded her statement.

23. In response to the complaint, Ms. Bell assured Plaintiff that the matter would be investigated and that her complaint would remain confidential.

24. Despite the severity of the misconduct and Ms. Bell's assurances that the

Company would take appropriate action to investigate and remedy the situation, defendant never followed-up with Plaintiff about her complaint, nor did it interview the witness she identified, Ms. Sollers.

25. Moreover, another coworker later informed Plaintiff that she was aware of her report about the sexual harassment, indicating to Plaintiff that the company had not held her communications about the harassment in confidence.

26. Upon information and belief, defendant has not fired Captain Gordon, nor taken any serious disciplinary action against him, nor has it taken any disciplinary action against any of the other officers who harassed Plaintiff.

27. Instead, shortly after she complained about the pervasive harassment and sexual assaults, defendant began a campaign of retaliating against her.

28. The retaliatory campaign included denying Plaintiff the 7:00 a.m. to 3:00 p.m. shift and the pay raise that she had been promised prior to her complaint of harassment. Indeed, defendant even denied her request to temporarily cover this shift during the week-long vacation of a coworker.

29. On October 4, 2018 attorneys retained by Plaintiff sent a letter raising concerns about the sexual harassment and early retaliation that had been imposed on Plaintiff.

30. After this letter was sent, there was another opening for an assignment working the 7:00 a.m. to 3:00 p.m. shift that Plaintiff had requested and which had previously been promised to her. Defendant refused her that assignment.

31. On October 12, 2018 (just barely over one week after her attorneys sent the

letter raising concerns about the harassment and reprisals), Plaintiff's niece was in a serious car accident and required urgent medical care. Plaintiff was scheduled to work October 13 and 14, but anticipated taking leave to help care for her niece and support other members of her family. At 1:30 p.m. on October 12, within an hour of learning of the emergency, she called Corporal William Sheeler, her immediate supervisor, to notify him of the emergency and need to miss her October 13 and 14 shifts. Corporal Sheeler acknowledged the seriousness of the situation and approved her absences. Defendant's time and attendance policy merely required her to provide notice of her absence to her supervisor more than four hours before the shift began, a requirement which Plaintiff fulfilled.

32. However, at 3:59 p.m. that same afternoon, Corporal Sheeler called back and told Plaintiff that she would be required to call again four hours prior to the start of her shift in order to request the time off. Notwithstanding the fact that this instruction contravened company policy, and that he had already approved the request, Plaintiff nevertheless complied and called Sheeler a few minutes before 3:00 a.m. on October 13 (her weekend shifts began at 7:00 a.m.). Sheeler did not answer, and accordingly Plaintiff tried calling him several more times prior to the start of her shift, but was unable to reach him. Plaintiff believed, however, that since she had already spoken with Sheeler, and had attempted to call him repeatedly, that she had provided him with appropriate notice, and she took the leave from work on October 13 and 14 to support her niece and family.

33. When she arrived for her scheduled shift on October 15, 2018, Corporal Sheeler instructed her to go home because she had allegedly failed to notify him of her absences on October 13 and October 14. He told her that she would be off duty until she met with

- 8 -

Company management on October 16 at 11:00 a.m. to discuss potential discipline for her absence.  Plaintiff was extremely upset by this unfair and seemingly retaliatory behavior, but complied with his instructions.

34. Upon information and belief, Corporal Sheeler is close friends and housemates with one of the officers – Lieutenant Griffin – who was a subject of Plaintiff's sexual harassment complaint.

35. On the morning of October 16, 2018, Plaintiff attended the meeting to discuss Corporal Sheeler's accusations.  At the meeting was Major Brown and Tiffany Chapman.  Both of them had previous knowledge about Plaintiff's harassment complaint, and (as noted above), Major Brown had actually witnessed at least one incident of harassment and had taken no action.  During the meeting, Brown and Chapman notified Plaintiff that the company was placing her on "indefinite suspension" for supposedly failing to notify her supervisors of her need to miss the shifts on October 13 and 14.  They gave her a written notice of disciplinary action at that time.  Plaintiff explained that the charges were false, and that she had spoken with Corporal Sheeler in advance, and attempted to call him again repeatedly before her shift began.  They did not seem to care about her reasonable explanation for her absence.  They also told her that she was being accused of a professional conduct infraction for having inadvertently referred to Lieutenant Parker as "Sergeant Parker."  Plaintiff explained that it was a simple mistake and that she meant no disrespect.  Plaintiff told them that she was very concerned that these accusations were actually intended to retaliate against her for her sexual harassment complaint.

36. On October 19, 2018, Plaintiff's attorneys sent the owner of the company a letter

asserting claims of unlawful retaliation.

37.     On October 24, 2018, Plaintiff was called into a meeting with Major Chapman and Chief Lawrence Harrington and informed that the company was issuing her a written "Final Warning" which falsely claimed that she had violated the Time and Attendance policy because she did not call out at least four hours before her October 13 shift.  Plaintiff had anticipated that the company might try to press this charge, so she obtained copies of phone records showing that she had in fact spoken with and then attempted to call Corporal Sheeler several times prior to her shift.  She showed them these phone records during the meeting.  Nevertheless, defendant did not retract the "Final Warning."  The warning also concluded, falsely, that Plaintiff had engaged in "unprofessional and discourteous" behavior, which Chapman orally explained related to her reference to Lieutenant Parker as "Sergeant."  Finally, the notice stated that the company had audited her past time and attendance and that she had supposedly called out more times than was allowed by policy, even though no one had ever advised, warned or disciplined her for any previous violations.  The written findings declared that any further infractions could result in termination.

38.     On October 28, Plaintiff attended her shift at her regularly assigned building located in the District of Columbia, and began to engage in a friendly discussion with one of the residents.  The resident told her that he was surprised to see her, because Corporal Sheeler had told him that Plaintiff had been fired, and escorted off the property.  Of course, these statements were false, but Plaintiff reasonably considered them to be evidence of Corporal Sheeler's intention to smear her reputation among the residents of the building she protected.

39.     On October 31, 2018, Plaintiff appeared for work at her regularly assigned location.  At that point, Corporal Sheeler told her that she was being reassigned and instructed to a different building.  The new building, which also was located in D.C., was considered by Plaintiff and other guards to be among the least desirable assignments, because the building was out of control, and considered to have more frequent and serious criminal activity.   Schiller provided no explanation for this sudden change in assignment.

40.     Plaintiff reasonably concluded that this was the most recent in a series of escalating retaliatory actions, which was designed to inflict, and which did in fact cause her, severe emotional distress.  Plaintiff was extremely upset, and started to cry.  Plaintiff's primary responsibility as an armed guard was to be a source of security and stability for the residents in the building.  Defendant's unrelenting retaliation was causing her to feel constant anxiety and dread, and she determined that she could not safely carry out the responsibilities of an armed guard under those conditions.  Plaintiff notified Corporal Sheeler that she could no longer work for the company, and gave him her keys and radio.  Sheeler did not try to persuade her to stay.  Plaintiff returned her service weapon to the company secure vault, and left the premises.

41.     The relentless sexual harassment and retaliation imposed upon Plaintiff by an array of high-level managers of defendant created a hostile and offensive work environment.  Apart from the harassment and retaliation, Plaintiff enjoyed her job and was very good at it.  She would not have decided to leave had she been treated fairly by defendant and not subjected to pervasive sexual harassment and escalating retaliation.  However, under those conditions, Plaintiff found her employment to be intolerable.  This conclusion was

reasonable.  Defendant's actions amounted to a "constructive discharge" of Plaintiff's employment.  This constructive discharge occurred in the District of Columbia.

42. The repeated discriminatory and retaliatory actions were taken by senior level officers of the company, and were condoned and ratified by human resources, the highest level management and the owner of the company.  These actions were designed to inflict, and did in fact inflict, severe emotional distress and humiliation upon Plaintiff.

43. Plaintiff and her witness Ms. Sollers have heard reports that other women within the company have endured similar sexual harassment and/or retaliation and were forced to leave the company after reporting it.

44. Plaintiff timely filed a charge of sex discrimination and retaliation with the U.S. Equal Employment Opportunity Commission (EEOC), which immediately cross-filed the complaint with local human rights agencies.  All administrative requirements to the filing of this lawsuit have been satisfied.

## COUNT ONE

(Sex Discrimination)

45. Defendant sexually harassed plaintiff and subjected her to a sexually hostile and offensive work environment by several of the highest officers within the company.  These actions created a hostile work environment and amounted to discrimination based on sex, in violation of Title VII of the Civil Rights Act of 1964, the DCHRA and the Prince George's County Code.

46. Defendant's actions were wanton, willful and malicious and taken in reckless disregard of plaintiff's civil and statutory rights.

47. These actions caused plaintiff significant humiliation, anxiety, anger, emotional

distress, damage to her career and loss of enjoyment of life.

## **COUNT TWO**

(Retaliation)

48.     Defendant punished plaintiff for her protected complaints of discrimination by taking the actions described in Paragraphs 28-41, above.  This retaliation violated Title VII of the Civil Rights Act of 1964, the DCHRA and the Prince George's County Code.

49.     Defendant's actions were wanton, willful and malicious and taken in reckless disregard of plaintiff's civil and statutory rights.

50.     These actions caused plaintiff significant humiliation, anxiety, anger, emotional distress, damage to her career and loss of enjoyment of life.

WHEREFORE, plaintiff asks that this Court:

1) Declare that defendant has violated plaintiff's civil and statutory rights by discriminating against plaintiff because of her sex and/or in retaliation for her protected complaints of discrimination, and enjoin defendant from further unlawful acts;

2) Award plaintiff all lost pay, bonuses, benefits, and privileges of her employment that she experienced as a result of defendant's unlawful conduct, and that she will continue to experience in the future from defendant's conduct;

3) Award plaintiff compensatory damages in an amount to be proven at trial;

4) Award plaintiff punitive damages in an amount to be proven at trial;

5) Award plaintiff her costs, including reasonable attorneys' fees;

6) Award plaintiff prejudgment interest on any back pay and/or bonus awards;

7) Award such other relief as the Court deems just.

## **JURY DEMAND**

Plaintiff requests trial by jury.

                                Richard A. Salzman, DC Bar # 422497
                                Sharon T. Rogart, DC Bar #1645202
                                HELLER, HURON, CHERTKOF & SALZMAN, PLLC
                                1730 M Street, NW, Ste. 412
                                Washington, DC  20036
                                (202) 293-8090

                                Attorneys for Plaintiff